In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 16-3418

DANIEL J. RATAJCZAK, JR., *et al.*,

*Plaintiffs-Appellants*,

*v.*

BEAZLEY SOLUTIONS LIMITED,

*Defendant-Appellee*.

_____

Nos. 16-3490 & 16-3920

LAND O'LAKES, INC.,

*Plaintiff-Appellant*,

*and*

FIRST MERCURY INSURANCE COMPANY, *et al.*,

*Intervening Plaintiffs, Cross-Appellees*,

*v.*

DANIEL J. RATAJCZAK, JR., *et al.*,

*Defendants-Appellees, Cross-Appellants*.

_____

Appeals from the United States District Court
for the Eastern District of Wisconsin.
Nos. 13-C-45 & 14-C-1388 — **William C. Griesbach**, *Chief Judge*.

_____

ARGUED MAY 23, 2017 — DECIDED AUGUST 31, 2017

_____

Before BAUER, EASTERBROOK, and RIPPLE, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Between 2006 and 2012 Packerland Whey Products, Inc., deceived at least one of its customers about the protein content of a product called Whey Protein Concentrate. Whey, the watery part of milk that remains after the removal of curds, is rich in protein. Removing whey's nonprotein components generates a concentrate that can be used in other products. Land O'Lakes, Inc., purchased Packerland's protein concentrate for use in making foods for calves and other young animals.

Buyers pay for protein. They infer protein levels from measuring nitrogen using the Kjeldahl method. This indirect measure invites adulteration: a seller could add another nitrogen-rich substance and so produce higher scores. Adulteration adds to profits as long as the substitute source of nitrogen is cheaper than whey. Urea, normally used to make fertilizer, is such a substance. Daniel J. Ratajczak, Jr., Scott A. Ratajczak, and Angela Ratajczak, who collectively owned and controlled Packerland, started adding urea to its protein concentrate in 2006. Land O'Lakes suspected that the concentrate was high in nonprotein nitrogen but could not learn why, in part because the Ratajczaks cooked up excuses that Land O'Lakes accepted. Land O'Lakes kept buying Packerland's protein concentrate, and none of its own customers complained. (In the levels Packerland added to the concentrate, animal-grade urea is safe to eat.)

The Ratajczaks sold Packerland in May 2012 to Packerland Whey Intermediary Holding Co., which kept them on

as employees—and they kept on adding urea. In November or December 2012 the buyer learned what was going on. The Ratajczaks were soon out of jobs, and litigation began. The buyer threatened suit against the Ratajczaks. They settled for about $10 million in December 2012, before the buyer filed a complaint. Land O'Lakes stopped buying Packerland's product and asserted three claims in federal court: breach of contract, fraud, and violation of the Racketeer Influenced and Corrupt Organizations Act. Each of these claims has bred ancillary insurance litigation. Packerland's insurers refused to defend or indemnify it or the Ratajczaks in the Land O'Lakes suit; the Ratajczaks' personal insurer refused to indemnify them for their settlement with Packerland's buyer.

The district court dismissed Land O'Lakes's suit and ruled in favor of the insurers. *Ratajczak v. Beazley Solutions Ltd.*, 2016 U.S. Dist. LEXIS 189240 (E.D. Wis. Aug. 17, 2016); *Land O'Lakes, Inc. v. Ratajczak*, 2016 U.S. Dist. LEXIS 186706 (E.D. Wis. Aug. 24, 2016). We have three appeals: (1) Land O'Lakes contends that it is entitled to treble damages under RICO and a state-law counterpart (which we do not mention again); (2) the Ratajczaks contend that Packerland's insurers had to defend and indemnify them in Land O'Lakes's suit; (3) the Ratajczaks maintain that their own insurer must indemnify them for much of what they paid to Packerland's buyer in settlement. We tackle the subjects in that order.

**1.** At its outset Land O'Lakes's suit had three claims: breach of contract, fraud, and treble damages under 18 U.S.C. §1964, RICO's civil remedies provision. The strongest of these was breach of contract. Land O'Lakes would have been entitled to the difference between the price it paid and the market value of the product Packerland delivered. But

the breach-of-contract claim was settled and the fraud claim has been abandoned on appeal, leaving only the RICO claim. The district court granted summary judgment to the Ratajczaks because Land O'Lakes failed to produce evidence of injury. RICO gives plaintiffs the benefit of the doubt in showing loss, see, e.g., *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985), but the district court thought that there is no doubt that could be resolved in Land O'Lakes's favor.

Consider how a firm in Land O'Lakes's position might show loss. (For this purpose we disregard the contract theory mentioned above, which Land O'Lakes does not invoke with respect to the RICO claim.) Land O'Lakes might contend, for example, that its own customers paid less for an inferior product made using the adulterated concentrate. It might contend that its customers paid the same per pound but bought less. It might contend that its business rivals raised their own prices between 2006 and 2012, but that Land O'Lakes could not do so because its customers thought its baby-animal feed inferior to that of the rivals. It might contend that it has been sued by its customers for selling adulterated animal feed and has incurred costs as a result. It might contend that some customers have threatened suit and that it is likely to incur future costs of defense. It might contend that, although none of its customers has threatened suit, one or more of them is likely to sue unless it offers some (expensive) inducement not to do so. It might contend that it recalled batches of animal feed that contained Packerland's adulterated protein concentrate and replaced them with good product at its own expense. It might contend that it incurred extra costs of testing Packerland's product in an effort to detect the source of the suspiciously high nonprotein ni-

trogen. From this extensive menu, Land O'Lakes chose: none of the above.

Land O'Lakes tells us that it did incur some extra testing costs but concedes that they cannot be quantified. It also notes that the statute of limitations in Wisconsin is still open on potential claims by the customers of animal feed that included Packerland's adulterated protein concentrate. That's true enough, but without any way to estimate the likelihood of such a claim, or the cost if one should be made, damages would be speculative.

There is a market in retroactive insurance. Once a casualty has occurred, people can buy policies that cover the cost of defending (and if necessary settling or paying) any future claims arising from that casualty. Retroactive insurance spreads the risk of outcomes' variability should claims be made. Land O'Lakes might have bought such a policy but did not, nor did it ask for a price quote. The price of a retroactive policy might help quantify potential loss. But all Land O'Lakes offered to the district court, or us, is lawyers' talk, which is not an adequate way to estimate the existence, let alone the size, of injury. And since treble zero is still zero, Land O'Lakes was doomed to lose its RICO claim.

**2.** Packerland had several insurance policies, under which the Ratajczaks were additional insureds. The insurers all refused to defend or indemnify them. Their request for a declaratory judgment gave several reasons, two of which the district court accepted, but we need mention only one. All of the policies base coverage on an "occurrence," and each defines that word this way: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Adulteration of a product is deliberate,

not accidental. The Ratajczaks observe that the fraud claim in the Land O'Lakes complaint says that some of Packerland's statements (those designed to lull Land O'Lakes into continuing to buy) may have been reckless if they were not deliberately false, but this does not move any of the underlying conduct (or its effects) into the "accident" category.

Wisconsin recognizes that deliberate *conduct* can have accidental *effects* that are covered by policies using the definition we have quoted. See *Liebovich v. Minnesota Insurance Co.*, 2008 WI 75 ¶52. Think of speeding: the driver intends to go 80 miles an hour but does not intend to plow into another car, and so a collision still may be called an "accident." But adulteration of a commercial product is not in that category. Packerland set out to fool Land O'Lakes into paying for more protein than its product contained. It achieved exactly that. Neither the behavior nor the consequence can be called an accident. See, e.g., *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86; *Everson v. Lorenz*, 2005 WI 51.

**3.** Before selling Packerland, the Ratajczaks purchased a policy of insurance promising to indemnify them for loss caused by breach of warranties made to the buyer. The policy, issued by Beazley Solutions, does not cover fraud but does cover damages for breach of contract. The contract of sale provided that a breach of warranty could come in two forms. One was a false statement in a Fundamental Representation—a list of specific representations made by Packerland on which the buyer relied. The other was a false statement not included among the Fundamental Representations. The contract set a cap of $1.5 million in damages for a false statement in the latter category. Beazley's policy had a limit of $10 million with a $1.5 million deductible (called a self-

insured retention). Beazley contended, and the district court found, that, if there was a nonfraudulent breach of warranty, the false statement was not among the Fundamental Representations, so contractual damages were capped at $1.5 million. As that matched the deductible, Beazley had no need to indemnify the Ratajczaks.

Insurance coverage usually depends on the nature of the victims' claims, and the draft complaint that the buyer showed to the Ratajczaks did not specify a falsehood in one of the Fundamental Representations. Instead it accused Packerland and the Ratajczaks of fraudulently concealing the adulteration and the fact that Packerland's profits had been artificially inflated, which could not continue because the truth was bound to emerge. The Ratajczaks insist that the buyer's complaint implies accusations that could have come under a Fundamental Representation, such as warranty 3.3 about the accuracy of Packerland's books and records. The draft complaint does not mention that representation, but the Ratajczaks remind us that in federal civil procedure complaints are liberally interpreted, so that to the extent the document is ambiguous resolution is handled through motions for more definite statements, motions for summary judgment, and briefs. So far, so good. Their problem is that there was no complaint, and Fed. R. Civ. P. 8 never came into play. The buyer *threatened* litigation but did not file a suit; the Ratajczaks settled to avoid suit. There was nothing that could be liberally construed in their favor vis-à-vis Beazley.

What the draft complaint *did* harp on is fraud, including fraudulent statements and omissions of material facts (such as the adulteration) necessary to make the statements not misleading. Fraudulent statements are outside Beazley's pol-

icy altogether. True enough, some of the draft complaint's language might be understood to specify negligent misstatements, such as some of the lulling statements the Ratajczaks used to prevent Land O'Lakes from looking too closely for the source of nonprotein nitrogen, but even if this gets past the policy's fraud exclusion it does not get past the contract's $1.5 million damages cap for breach of any warranty other than a Fundamental Representation.

The Ratajczaks ask rhetorically why they would settle for $10 million if their contractual liability was capped at $1.5 million, but there is a ready answer: there was no contractual cap on liability for fraud. And the fact of settlement is itself a problem for the Ratajczaks. Beazley's policy provides that it is not bound by settlements that it did not approve. Beazley not only didn't approve the settlement but also was not notified of the claim until the settlement talks were almost done. The Ratajczaks insist that Beazley can't prove prejudice from the delay—how could one *prove* that a different sequence of events, or more time to think things over, investigate, and make suggestions, would have produced a different outcome?—but the policy does not demand that Beazley prove prejudice. The approval requirement is absolute.

This situation shows why. Beazley received notice of the claim less than a week before the settlement was concluded. To be precise, the Ratajczaks notified Beazley after the close of business on December 24, 2012, and signed the settlement on December 28. That was two business days' notice. It may take an insurer longer just to find the policy and send it to adjusters or analysts to begin an evaluation. It would require time after that to study a proposed settlement and make suggestions, time that the Ratajczaks did not allow. After re-

ceiving notice, Beazley swiftly asked the Ratajczaks for more information about the adulteration and the proposed settlement; they closed on the settlement before replying. That haste prevented Beazley from trying to allocate potential loss among three categories: loss attributable to fraud (not covered), loss attributable to nonfraudulent breach of a nonspecific warranty (capped at $1.5 million), and loss attributable to nonfraudulent breach of a Fundamental Representation (covered to the policy limit). By cutting Beazley out of the negotiations, the Ratajczaks prevented it from taking steps vital for self-protection.

The Ratajczaks' riposte is that Wisconsin law applies a prejudice requirement even if the policy does not. *Gerrard Realty Corp. v. American States Insurance Co.*, 89 Wis. 2d 130, 146–47 (1979). Prejudice might be presumed (which would make sense here), but the Ratajczaks maintain that a presumption is not enough. Indeed, the Ratajczaks maintain that Wisconsin law forbids clauses that give insurers authority to reject settlements, if they have received notice of the negotiations. They rely on *International Flavors & Fragrances v. Valley Forge Insurance Co.*, 2007 WI App 187.

That may or may not be a correct statement of Wisconsin law, but the controlling law is New York's. The policy provides for the application of New York law. This was a multijurisdictional business transaction. Beazley is based in the United Kingdom. Its adjuster for U.S. claims is located in New York. It is understandable that Beazley prefers to designate one state's law for all of its business in this nation; it can become familiar with New York law more easily than it can master (and price) the intricacies of many states' insurance laws. The Ratajczaks are sophisticated business people

and entered this transaction with eyes open; they cannot escape the choice-of-law clause in this policy. New York permits insurers to insist on having control of settlements. *Vigilant Insurance Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 177–78 (2008). So the Ratajczaks lose for two reasons: the deductible offsets the maximum damages for breach of a general warranty, and they settled without Beazley's consent.

Other arguments have been considered but do not require discussion.

AFFIRMED